**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

---

ALICIA MENDEZ, individually and on behalf of all others similarly situated,

        Plaintiff,

    vs.

THE PROCTER & GAMBLE COMPANY; the PROCTER & GAMBLE U.S. BUSINESS SERVICES COMPANY; and THE PROCTER & GAMBLE POLICY COMMITTEE,

        Defendants.

**Civil Action No.: 1:26-cv-00120**

**CLASS ACTION COMPLAINT**

---

Plaintiff Alicia Mendez ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against The Procter & Gamble Company, the Procter & Gamble U.S. Business Services Company, and the Procter & Gamble Policy Committee (collectively, "P&G," or "Defendants") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

**NATURE OF THE ACTION**

1.      It is both unfair and unlawful for entities like P&G to impose discriminatory and punitive health-insurance surcharges on employees and their families based on tobacco or nicotine use. This action challenges P&G's unlawful practice of charging a monthly "nicotine surcharge" under the Procter & Gamble U.S. Active Preferred Provider Organization Health Plan (a component of the Procter & Gamble Health & Long-Term Disability Plan) (the "Plan") without complying with the nondiscrimination and wellness program requirements of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Public Health Service Act ("PHSA").

1

Under ERISA, health-contingent wellness programs that condition premiums on health factors, such as nicotine use, must provide each individual participant with clear notice and a reasonable alternative standard that enables the individual to obtain the full reward, including retroactive reimbursement of all surcharges paid during completion of the program. *See* 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3); 29 C.F.R. § 2590.702(f)(4); 45 C.F.R. § 146.121(f)(4).

2. Instead of complying with these mandatory protections, P&G imposes a $30 monthly nicotine surcharge that is discriminatory, punitive, and unlawful. P&G's plan materials fail to include the required notice disclosures, including a statement that the recommendations of a participant's physician will be accommodated in determining a reasonable alternative standard. In addition, P&G structures the program so that the surcharge is imposed for the entire Plan year and remains in place regardless of changes during the year (including quitting nicotine use or enrolling in and completing the cessation program). Participants have a limited, single opportunity to access the full reward by selecting a special "Nicotine User/Completing Quit For Life" status during annual enrollment. Participants must then enroll in the program between January 1 and January 31 of the plan year and complete the program. The materials likewise contain no disclosure of any make-whole mechanism or reimbursement for surcharges assessed before completion of the program, effectively denying participants the full value of the reward and a meaningful opportunity to qualify during the year. Together, the plan's 31-day enrollment window, its rule locking the surcharge in for the entire year even after participants have stopped smoking, and its failure to provide contact information for accessing the alternative standard or the physician-accommodation statement renders the program not reasonably designed to promote health, overly burdensome, and a subterfuge for discrimination. As a result, employees and their families are

2

unlawfully deprived of clear information and a realistic avenue to avoid the surcharge, in violation of ERISA and the PHSA.

3.      Tobacco surcharges have become more prevalent in recent years but, to be lawful, plans must make available a *compliant* "wellness programs" that provides employees with an avenue to avoid the surcharge. Making a compliant wellness program available means employers *must* adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "***must be satisfied***" to qualify for the statutory exception or safe-harbor. Employers can only invoke this safe harbor if they can demonstrate full compliance with all the requirements. Moreover, while courts are no longer required to defer to an agency's interpretation of an ambiguous *statute* under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), courts must still defer to an agency's interpretation of its own *regulations*, if that interpretation is neither plainly erroneous nor inconsistent with the regulatory framework. *Auer v. Robbins*, 519 U.S. 452 (1997); *Kisor v. Wilkie*, 588 U.S. 558 (2019).

4.      The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income

and vulnerable workers who end up subsidizing their healthier colleagues.[1] The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.

5.     ERISA permits outcome-based programs,[2] such as being tobacco-free or completing a smoking cessation program, only if the employer offers a "*reasonable* alternative standard." ERISA's wellness-program rules impose strict notice requirements. A plan conditioning premiums on a health factor must disclose, in all plan materials describing the surcharge or discussing a premium differential on the basis of a health factor, that a *reasonable* alternative standard is available; how to obtain it; and that a participant's physician's recommendations will be accommodated. 29 C.F.R. § 2590.702(f)(4)(v). P&G fails to include compliant notice in its enrollment guides and summary plan description ("SPD"). Upon information and belief, P&G provides other participant-facing materials discussing the surcharge that fail to include proper notice.

---

[1] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[2] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

6.      P&G's wellness program is unreasonable and unlawful because it fails to make a reasonable alternative standard meaningfully and uniformly available and fails to provide the mandatory notice required by the wellness regulations. Although P&G nominally identifies a nicotine-cessation program as an alternative standard, access to that program is limited to a narrow, front-loaded enrollment window, and participants who miss that window, or who quit nicotine use later in the plan year, are categorically denied any opportunity to avoid or recover the surcharge. Further, the Plan materials, including enrollment guides and the SPD, omit the required disclosures. The paragraphs discussing the nicotine surcharge omit altogether the necessary physician-accommodation statement. As administered and communicated, the surcharge therefore operates as a penalty rather than a compliant wellness incentive, is not reasonably designed to promote health or prevent disease and cannot qualify for the statutory safe harbor under ERISA and the PHSA. No amount of *post hoc* justifications can cure these fundamental defects. This type of discrimination is permissible only if employers meet strict criteria, which Defendants do not.

7.      Participants like Ms. Mendez are permitted to challenge a surcharge when there is no compliant wellness program offered or when there is no notice of all the avenues available to avoid the surcharge. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions and alleges facts to support the deficiency in the wellness program, the burden shifts to the employer to demonstrate that its wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to make available the "full reward" and to notify participants of the same. *See Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1029 (2025) (reaffirming "that 'the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to Defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions.*'").

8.      Plaintiff was an employee of P&G who paid the unlawful tobacco surcharge to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiff and continues to impose such a burden on those similarly situated.

9.      Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent P&G from continuing to profit from its violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, P&G is a fiduciary of the Plan who has a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of herself and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

## **PARTIES**

10.      Plaintiff Alicia Mendez is, and at all times mentioned herein was, an individual citizen of the State of California residing in the County of Santa Clara. Plaintiff was an employee of P&G, who paid a tobacco surcharge of $30 per month (roughly $360 annually) associated with the Plan. Plaintiff was required to pay this tobacco surcharge to maintain health insurance under the Plan. The payroll deductions reflect a monthly medical premium that is $30 higher than the published 2022 PPO premium for Plaintiff's coverage tier, which is consistent with the Plan's nicotine surcharge being assessed.

11.      Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

12.      Defendant, The Procter & Gamble Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio. P&G is a global consumer staples corporation that manufactures and markets consumer goods. P&G is the plan sponsor.

13.     Defendant, The Procter & Gamble U.S. Business Services Company, is an Ohio corporation with its principal place of business in Cincinnati, Ohio and the Plan Administrator of the Plan.

14.     Defendant, The Procter & Gamble Policy Committee, is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

15.     At all times relevant to this lawsuit, Defendants sponsored, maintained, and managed the Plan. As of June 30, 2024, there were over 26,000 participants in the Plan. Defendants' employee benefit plan is subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3).

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17.     This Court has personal jurisdiction over Defendants because they are headquartered in this District and have purposefully availed themselves of the privilege of conducting business in Ohio.

18.     Venue is proper in this District under 29 U.S.C. § 1132(e)(2) because Defendants are headquartered in this District and this is a District in which Defendants may be found.

## FACTUAL BACKGROUND

I.     **DEFENDANTS' TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE**

    **A.  Statutory and Regulatory Requirements**

19.     To expand access to affordable health insurance coverage, the Affordable Care Act ("ACA") amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

20.     The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to *programs of health promotion and disease prevention*" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

21.     Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

22.     Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the ACA and Public Health Service Acts, in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

23.     The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

24.     The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and they prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is

noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the [] requirements are satisfied***.").

### B. Regulatory Criteria

25. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii).

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any ***individual*** who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)(emphasis added).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that participants' personal physician's recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

26. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

27. Regarding the first criteria, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

28. For health contingent wellness programs, the Final Regulations require the notice be disclosed "in *all* plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge their participants more and fail to inform participants of a reasonable alternative standard to the surcharge violate these requirements.

## II.   DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

29.   Defendant's tobacco surcharge is imposed through an outcome-based wellness program that fails to satisfy ERISA's statutory and regulatory requirements. The Plan does not include the required physician-accommodation statement in any plan materials, including the SPD or enrollment materials, and the 2024 enrollment guide omits any contact information or instructions explaining how participants may access a reasonable alternative standard. Instead, the program restricts access to the nicotine cessation alternative to a narrow and inflexible 30-day enrollment window that operates as a barrier, rather than a pathway, to avoiding the surcharge. Participants who miss that window are categorically denied any opportunity to qualify for the reward during the plan year, even if they subsequently complete a cessation program, reduce tobacco use, or quit smoking altogether, and even though they remain enrolled in the Plan for the entire year. The Plan further prohibits participants from changing their tobacco-use status mid-year under any circumstances, disqualifying participants who take health-promoting steps after enrollment from obtaining any reward. These structural features are not reasonably designed to promote health or prevent disease and instead function to ensure continued assessment of the surcharge, in violation of ERISA and the implementing wellness-program regulations.

30.   The Plan imposes a monthly "Nicotine Surcharge" of $30 per month, per Nicotine User, assessed separately for the employee and any enrolled spouse or domestic partner. Thus, if both the employee and the spouse/domestic partner are deemed Nicotine Users, the employee's premium "will include an additional $60 per month."

31.   P&G conditions avoidance of the surcharge on a narrow, front-loaded election and enrollment process. The Benefit Guide states that a participant can avoid the surcharge only by (i) selecting a specific certification status ("Nicotine User/Completing Quit For Life") during annual

12

enrollment, and then (ii) enrolling in Quit For Life between January 1 and January 31, 2024, and (iii) completing the program. In other words, even though the surcharge is assessed monthly for the entire plan year, P&G restricts enrollment in its cessation pathway to a roughly four-week window at the start of the calendar year. Requiring participants to pre-select (i.e., "check the box") at annual enrollment indicating an intent to complete Quit For Life is not a reasonable condition because, if a participant does not select that option but later decides to—and, indeed, does— complete the program midyear, the Plan still does not provide the full reward for that year. P&G's wellness program creates unequal outcomes for similarly situated participants who attempt to satisfy the same cessation goal. Under P&G's Plan, participants who are nicotine users but miss the January enrollment window, or who do not select the one certification status that preserves eligibility, are categorically denied any meaningful opportunity to avoid the surcharge during the plan year. Even participants who actually quit using nicotine during the year are compelled to pay the surcharge through year-end, producing a premium penalty that is disconnected from health improvement and cessation outcomes.

32.     The Plan expressly denies participants the ability to avoid or reduce the surcharge once it is triggered, no matter what they do next. The enrollment guide further states that if a participant (a) certifies that the employee, spouse, or domestic partner is a Nicotine User, or (b) chooses "Opt Out of Disclosing" nicotine status, the participant "will be subject to the Nicotine Surcharge" for the plan year, and that the surcharge "will remain in place for the entire plan year regardless of changes" during the year, including if the participant quits using nicotine, enrolls in Quit For Life, or later seeks to disclose non-nicotine status.

33.     The SPD states that Covered Employees and Covered Spouses/Domestic Partners who are Nicotine Users will be charged the Nicotine Surcharge and that the surcharge can be

13

avoided by completing a Carrier-sponsored cessation program; however, the SPD omits the required disclosure that a participant's personal physician's recommendations will be accommodated and omits embedded instructions on how to obtain a reasonable alternative standard, as required by 29 C.F.R. § 2590.702(f)(4)(v). Neither the enrollment guides nor the SPD contain the physician-accommodation statement.

34.     P&G's failure to provide compliant notice in its 2024 enrollment materials is particularly evident when contrasted with its own prior practices. The 2022 Enrollment Guide included a dedicated "Contact Information" section identifying clear instructions for obtaining assistance with benefit-related questions. In contrast, the 2024 Enrollment Guide's nicotine surcharge disclosures contain no contact information, no instructions for how to request a reasonable alternative standard, and no statement that a participant's personal physician's recommendations will be accommodated. This regression in disclosure deprived participants of information P&G itself previously provided and reasonably led participants to believe that no alternative process or accommodation was available beyond the rigid annual enrollment framework.

35.     By failing to include the required physician-accommodation disclosure in the very materials that impose and explain the nicotine surcharge, P&G misleads participants into believing that completion of its designated smoking cessation program is the sole path to avoiding or eliminating the surcharge. Courts have held that omission of this disclosure is itself a violation of ERISA's wellness-program rules, regardless of whether an employer might accommodate a physician recommendation in practice. *See Chirinian v. Travelers Co.*, No. 24-cv-3956, 2025 U.S. Dist. LEXIS 144669, at *28 (D. Minn. July 29, 2025) ("there is no dispute that the Summary Plan Description lacks the language required …. To impose a tobacco surcharge on plan participants

without running afoul of ERISA's antidiscrimination rules, [defendants] must satisfy 'all of the [regulatory] requirements" of an outcome-based wellness program …. All means all. This is the case no matter how small the requirement may be."). P&G's failure to provide this basic notice renders its purported reasonable alternative standard opaque, inaccessible, and non-compliant.

## III. DEFENDANTS' SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

36. Defendants administered the tobacco surcharge by designating which participants were charged and withholding the surcharge directly from participants' wages as a before-tax deduction, alongside required employee premium contributions for medical coverage. These deductions were not imposed as post-tax penalties or payroll adjustments; they were taken in the same manner, at the same time, and for the same stated purpose as other employee contributions used to fund Plan coverage.

37. The governing Plan documents confirm that the Plan is funded through a combination of company contributions and employee contributions, and that employee contributions and other plan assets are held in a trust. Under this structure, the company initially pays Plan benefits and expenses from its general assets and is then reimbursed from the trust with funds held on behalf of the Plan, subject to the availability of Plan assets. Consistent with this framework, amounts withheld from participants' wages for the purpose of paying Plan premiums constitute participant contributions and become Plan assets no later than the moment they are withheld, within the meaning of 29 C.F.R. § 2510.3-102(a).

38. By withholding the tobacco surcharge as a before-tax payroll deduction alongside required premium contributions, Defendants caused those surcharge amounts to become Plan assets at the moment of withholding. Yet instead of ensuring that the surcharge amounts flowed

into the trust and increased the pool of assets available to reimburse Plan benefits and expenses, Defendants used the surcharge as an internal accounting offset to reduce the amount of company funds it otherwise would have contributed to support the Plan. Because the cost of coverage for each participant is fixed, each dollar of surcharge collected reduced P&G's contribution on a dollar-for-dollar basis, leaving the Plan no better funded than it would have been absent the surcharge.

39.     This practice constitutes classic self-dealing because Defendants manipulated the Plan's funding mechanism to shift costs away from itself and onto participants, causing the Plan to lose employer contributions and, at the same time, resulting in a profit to P&G. In doing so, Defendants failed to act solely in the interest of participants and beneficiaries, violated the duty of loyalty and prudence under ERISA § 404, and engaged in prohibited transactions under ERISA § 406 by using Plan assets for the company's own benefit. The result was a direct financial gain to P&G—through reduced Company contributions and retained funds earning interest in its own accounts—at the expense of the Plan and its participants. This diversion of funds is self-dealing, violates the duty of loyalty, and constitutes a prohibited transaction under ERISA §§ 404 and 406.

## CLASS DEFINITION AND ALLEGATIONS

40.     Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

41.     Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendants.

16

42.     Excluded from the Class are P&G's officers and directors.

43.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

44.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1).

45.     **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains thousands of participants who have been damaged by Defendants' conduct as alleged herein, the identity of whom is within the knowledge of Defendants and can be easily determined through Defendants' records.

46.     **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

    a.  Whether Defendants' tobacco surcharge discriminates against participants based on a health status related factor;

    b.  Whether the smoking cessation program constitutes a *reasonable* alternative standard by which a participant, on his or her own, could receive the "full reward" of the tobacco surcharge;

    c.  Whether Defendants provided the required notice in ***all*** the plan materials describing the surcharge;

    d.  Whether Defendants provided the required statement that participants' personal physicians' recommendations would be accommodated;

    e.  Whether Defendants' wellness program violates ERISA and the Final Regulations;

    f.  Whether Defendants breached their fiduciary duties by collecting and retaining the tobacco surcharge;

    g.  Whether Defendants breached its fiduciary duties by failing to periodically review the terms of its wellness program and the communications sent to participants to ensure compliance with ERISA and applicable regulations;

    h.  The appropriate mechanisms to determine damages on a class-wide basis

47.     **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharge. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

48.     **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendants and were harmed by Defendants' misconduct in that they were assessed unfair and discriminatory tobacco surcharges. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

49.     **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her. Further, even if the Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By

18

contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

50. Plaintiff seeks declaratory and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide declaratory relief is issued, Defendants may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE A REASONABLE ALTERNATIVE STANDARD
### (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv); 45 C.F.R. § 146.121(f)(4)(iv))

51. Plaintiff re-alleges and incorporates herein by reference allegations 1–49 of this Complaint.

52. Defendant unlawfully imposes a $30 monthly nicotine-based premium differential on Plan participants who use tobacco products, in violation of ERISA § 702. By conditioning avoidance of a monthly nicotine surcharge on rigid enrollment mechanics and withholding premium relief from participants based on timing, certification status, and administrative defaults, rather than on satisfaction of a health-related standard, Defendant discriminates on the basis of a health factor without satisfying the regulatory conditions required to qualify for ERISA's wellness-program safe harbor, in violation of ERISA § 702(b), 29 U.S.C. § 1182(b)(1).

53. ERISA's wellness program regulations require that the "full reward" associated with an outcome-based wellness program be made available to all similarly situated individuals

who satisfy the applicable standard, including through a reasonable alternative standard. Defendant's program fails this requirement in multiple, independent ways. As structured and disclosed, the Plan makes the "reward" of surcharge avoidance available only to participants who (a) select a particular certification status during Annual Enrollment, and (b) enroll in the cessation program during a narrow, front-loaded window at the beginning of the Plan year. Participants who are otherwise similarly situated (i.e., nicotine users seeking to avoid the surcharge) are categorically denied access to the reward if they miss that window, even if they later quit using nicotine or seek to participate in cessation programming.

54. By defining eligibility for the reward based on enrollment timing and certification formalities, rather than on whether a participant satisfies the applicable health standard, Defendant withholds the full reward from participants who are similarly situated in all material respects except for when and how they navigated the Plan's enrollment process. The Plan further fails to disclose that the reward is unavailable once the enrollment window closes and affirmatively states that the surcharge remains in place for the entire plan year regardless of cessation or program participation thereafter. This structure ensures that the "full reward" is not uniformly available to all participants who seek to satisfy the alternative standard and instead operates to lock in premium penalties based on process rather than health outcomes.

55. Defendant's program also violates the full-reward requirement because it conditions access to the reward on factors beyond the participant's own satisfaction of the standard, including default rules that roll participants into surcharge status and prevent later qualification. As a result, participants who engage in the same health-improving conduct (i.e., cessation of nicotine use) receive materially different economic outcomes based solely on enrollment timing or defaulted certification status. ERISA's wellness regulations do not permit a system in which

20

similarly situated participants who pursue the same health outcome are denied the full reward due to administrative barriers unrelated to health.

56. Because Defendant's nicotine surcharge program fails to make the full reward uniformly available, is not reasonably designed to promote health or prevent disease, and does not satisfy the mandatory regulatory conditions applicable to outcome-based wellness programs, it cannot qualify as a lawful "program[] of health promotion and disease prevention" under ERISA or the PHSA. The surcharge therefore constitutes unlawful health-status discrimination in violation of 29 U.S.C. § 1182(b)(2)(B), 42 U.S.C. § 300gg-4(j), and 29 C.F.R. § 2590.702(f).

57. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to enjoin any act or practice that violates ERISA or the terms of the Plan and to obtain appropriate equitable relief to redress such violations. Because Defendant's surcharge program does not satisfy the regulatory criteria required to qualify for the statutory safe harbor, Plaintiff and the Class are entitled to declaratory and injunctive relief, including an order prohibiting enforcement of the nicotine surcharge and requiring Defendants to administer any wellness program in compliance with ERISA's anti-discrimination and full-reward requirements.

**COUNT II**
**UNLAWFUL SURCHARGE – FAILURE TO PROVIDE REQUIRED NOTICE**
**(Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v))**

58. Plaintiff re-alleges and incorporates herein by reference allegations 1–49 of this Complaint.

59. Defendants' tobacco surcharge program is not and was not a permissible wellness program because Defendants failed to provide the mandatory notice of the availability of a *reasonable* alternative standard in the Plan materials describing the surcharge, as required by 29

C.F.R. § 2590.702(f)(4)(v). The Final Regulations require that any materials describing an outcome-based wellness program and its associated premium differential must include clear notice that a reasonable alternative standard is available, including contact information and a statement that the recommendations of an individual's personal physician will be accommodated and instructions for how to obtain such an alternative. Defendants' enrollment guides and other participant-facing materials describing the nicotine surcharge omit these required disclosures.

60. Specifically, Defendants' Plan materials describing the nicotine surcharge, including the enrollment guides that explain certification options, default rules, and the conditions under which the surcharge applies, do not state that physician recommendations will be accommodated and, for some years, do not identify any contact information for obtaining such an accommodation in connection with the surcharge. This omission is significant because Defendants' materials affirmatively describe a rigid and punitive framework, requiring selection of a specific annual enrollment status and enrollment during a narrow January window and stating that the surcharge remains in place for the entire plan year regardless of cessation or later program participation, without informing participants that federal law requires individualized accommodations and alternative pathways. By failing to include the required notice, Defendants deprived participants of a fair and informed opportunity to avoid the surcharge.

61. Defendants' failure to provide compliant notice is not a technical or harmless defect. The wellness regulations expressly require that all conditions, including the notice requirements, "*must be satisfied*" for a program to qualify as a lawful wellness program. Because Defendants did not satisfy those mandatory conditions, the tobacco surcharge program is ineligible for ERISA's wellness-program safe harbor. As a result, Defendants' imposition of the tobacco

surcharge constitutes unlawful discrimination based on a health-status-related factor, in violation of ERISA § 702, 29 U.S.C. § 1182(b)(1), and PHSA § 2705, 42 U.S.C. § 300gg-4.

62.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to enjoin any act or practice that violates ERISA or the terms of a plan and to obtain other appropriate equitable relief to redress such violations or enforce ERISA's requirements. Because Defendants' surcharge program does not satisfy the criteria required to qualify as a compliant "program[] of health promotion and disease prevention," Defendants cannot invoke the statutory safe harbor, and Plaintiff and the Class are entitled to declaratory and injunctive relief under ERISA § 502(a)(3).

**COUNT III**
**BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF)**
**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)**

63.     Plaintiff re-alleges and incorporates herein by reference allegations 1–49 of this Complaint.

64.     At all relevant times, P&G was the administrator of the Plan and a fiduciary within the meaning of ERISA, 29 U.S.C. § 1002(21), because it exercised discretionary authority and control over the management and disposition of Plan assets, the design and administration of the Plan's premium structure, and the implementation and operation of the tobacco surcharge and related wellness programs.

65.     ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye

single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

66.     Defendants breached these duties by administering the tobacco surcharge in a manner designed to benefit P&G at the expense of the Plan and its participants. Defendants withheld tobacco-surcharge amounts directly from participants' wages as before-tax deductions, alongside other required employee premium contributions. Because these deductions were taken for the purpose of funding Plan coverage and in the same manner as other employee contributions, they became Plan assets at the moment of collection. Rather than ensuring those assets were used to increase Plan funding, Defendants diverted the surcharge proceeds to reduce P&G's own financial obligations to the Plan.

67.     Under the Plan's funding structure, medical coverage is supported by a combination of employee premium contributions and employer contributions. The tobacco surcharge should have operated, if lawfully imposed, as an additional source of Plan funding. Instead, Defendants used surcharge proceeds to displace employer contributions on a dollar-for-dollar basis. Because the cost of coverage for each participant is fixed, every dollar collected as a surcharge reduced the amount P&G otherwise would have contributed to support Plan benefits, leaving the Plan no better funded and shifting costs from P&G to participants.

68.     Defendants breached these duties by administering a surcharge program that violated ERISA's nondiscrimination requirements, by failing to offer or operate a compliant reasonable alternative standard for employees or dependents, and by structuring the tobacco surcharge in a manner that shifted costs to participants while reducing P&G's own financial obligations to the Plan. P&G exercised discretionary authority over how surcharge proceeds were

handled, whether individuals would ever receive the full reward, and what information was communicated to participants about their rights under the Plan.

69.     Upon information and belief, P&G's U.S. Business Services Company and/or Policy Committee approved, and authorized the distribution of the enrollment guides, SPDs, and related participant-facing materials describing the nicotine surcharge and the conditions under which it applies. Those materials omitted mandatory disclosures required by ERISA's wellness-program regulations, including a statement that a participant's personal physician's recommendations would be accommodated, instructions for requesting a reasonable alternative standard, and (for some years) contact information for obtaining such an alternative in connection with the surcharge. Although the SPD references the existence of the nicotine surcharge, it likewise fails to include the required disclosures necessary to inform participants how to avoid the surcharge in compliance with federal law. Despite clear regulatory requirements that wellness program terms affecting premiums be accurately and fully disclosed, Defendants failed to conduct prudent or periodic reviews of the surcharge program or its communications to ensure compliance with ERISA. Instead, Defendants approved and maintained a structurally defective surcharge scheme and allowed it to persist year after year, depriving participants and their dependents of material information and lawful rights, and depriving the Plan of employer contributions it otherwise should have received

70.     Defendants also breached their duty of prudence by failing to periodically review the surcharge program, the Plan's funding mechanics, and the participant-facing communications describing the premium differential to ensure compliance with ERISA. Despite year-over-year administration of the surcharge, Defendants failed to correct known structural defects, including the absence of required notice disclosures, the denial of uniform access to the full reward, and the

improper treatment of surcharge proceeds. This failure allowed a noncompliant and discriminatory surcharge program to persist and deprived the Plan of employer funding it should have received.

71.     These actions were disloyal. Rather than acting solely in the interest of participants and beneficiaries, Defendants structured and administered the surcharge to achieve corporate cost savings. Surcharge proceeds that should have increased Plan assets instead reduced P&G's own contributions, leaving P&G with retained funds that remained in its accounts and generated financial benefit for the Company, while the Plan and its participants bore increased costs.

72.     Defendants' conduct also constituted prohibited transactions. By using Plan assets—namely, participant-paid surcharge amounts—to offset P&G's own funding obligations, Defendants caused the Plan to engage in transactions that constituted a direct or indirect transfer of Plan assets for the benefit of a party in interest, in violation of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1). P&G is a party in interest under ERISA because it is both the Plan sponsor and a fiduciary exercising discretionary authority over Plan assets.

73.     Defendants further violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with Plan assets for their own account. The tobacco surcharge amounts should have supplemented, not supplanted, P&G's employer contributions. By retaining and misusing those assets, Defendants engaged in self-dealing, benefitted from the float, and left the Plan with less funding than required under its governing documents.

74.     Defendants also violated ERISA § 406(b)(2) by acting on behalf of interests adverse to the Plan and its participants. Defendants' decisions regarding surcharge administration, notice, and funding allocation prioritized P&G's financial interests over the interests of participants, deprived participants of material information necessary to avoid the surcharge, and ensured that similarly situated individuals could not obtain the full reward for the plan year.

75.     As a direct and proximate result of these fiduciary breaches, the Plan and its participants suffered losses, including millions of dollars in unlawful surcharge amounts deducted from participants' paychecks and the loss of employer contributions that should have funded Plan benefits.

76.     Plaintiff brings this claim on a representative basis on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Defendants are liable to restore to the Plan all losses resulting from their breaches of fiduciary duty, to disgorge all unjust enrichment and ill-gotten profits, and to provide all appropriate equitable and remedial relief under ERISA § 409, including restoration of funds to the Plan or a constructive trust.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY (INDIVIDUAL-LEVEL RELIEF)**
**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)**

77.     Plaintiff re-alleges and incorporates herein by reference allegations 1–49 of this Complaint.

78.     At all relevant times, P&G was the administrator of the Plan and a fiduciary within the meaning of ERISA, 29 U.S.C. § 1002(21), because it exercised discretionary authority and control over the management and disposition of Plan assets, the design and administration of the Plan's premium structure, and the implementation and operation of the tobacco surcharge and related wellness programs.

79.     ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye

27

single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

80.     Defendants breached these duties by administering and enforcing a noncompliant tobacco surcharge program that resulted in unlawful deductions from Plaintiff's and Class members' paychecks. Defendants exercised discretionary authority over which participants were charged the surcharge, how those charges were communicated, and whether participants could realistically avoid the surcharge through a lawful wellness alternative. Rather than acting in participants' interests, Defendants administered the program to generate corporate cost savings at participants' expense.

81.     Upon information and belief, Defendants controlled and disseminated the Enrollment Guides, Summary Plan Description, and other Plan communications describing the tobacco surcharge and the conditions under which it applied. Those communications failed to disclose material information necessary for participants to protect their interests, including the right to physician accommodation and instructions for requesting such alternatives. Defendants also failed to disclose that avoidance of the surcharge was effectively foreclosed after a narrow, front-loaded enrollment window, causing participants, including Plaintiff, to reasonably believe that no lawful alternative was available.

82.     Defendants further breached their fiduciary duties by failing to conduct prudent and periodic reviews of the surcharge program and related communications to ensure compliance with ERISA and its implementing regulations. Instead, Defendants permitted a structurally defective wellness program to persist year after year, despite its discriminatory effects and despite the financial harm imposed on participants who paid the surcharge without a lawful opportunity to avoid it.

83.     As a result of these fiduciary breaches, Defendants unjustly enriched themselves at Plaintiff's expense. By deducting unlawful tobacco surcharges directly from participants' wages and using those amounts to offset P&G's own funding obligations, Defendants shifted costs away from the Company and onto Plaintiff and similarly situated participants. These deductions were taken as before-tax contributions, indistinguishable in form from lawful Plan contributions, and deprived participants of wages they otherwise would have retained.

84.     Defendants' conduct also constituted prohibited transactions under ERISA. By using participant-paid surcharge amounts to reduce P&G's own financial obligations to the Plan, Defendants caused a direct or indirect transfer of Plan assets for the benefit of a party in interest— namely, P&G itself—in violation of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1). P&G is a party in interest under ERISA because it is the Plan sponsor and a fiduciary exercising discretionary authority over Plan administration and assets.

85.     Defendants further violated ERISA § 406(b)(1) and (b)(2), 29 U.S.C. § 1106(b)(1)– (2), by dealing with Plan assets for their own account and by acting on behalf of interests adverse to the Plan and its participants. Defendants' decisions regarding surcharge administration, notice, and funding allocation prioritized corporate cost savings over participants' rights and deprived Plaintiff of the ability to make informed decisions regarding Plan participation and premium costs.

86.     Defendants breached their fiduciary duties by, among other things: administering a wellness program that did not comply with ERISA's anti-discrimination requirements; failing to make the full reward of surcharge avoidance meaningfully and uniformly available; failing to disclose material information regarding reasonable alternative standards and physician accommodations; and failing to prudently monitor the surcharge program and related

29

communications. Had Defendants complied with their fiduciary obligations, Plaintiff could have avoided the unlawful surcharges and retained wages improperly deducted from her paycheck.

87. As a direct and proximate result of these fiduciary breaches, Plaintiff and Class members suffered concrete financial harm in the form of unlawful tobacco surcharge deductions and were deprived of the opportunity to avoid those charges through a lawful wellness program.

88. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek appropriate individual equitable relief to redress Defendants' fiduciary breaches, including restitution of unlawfully deducted amounts, surcharge, disgorgement of ill-gotten gains, imposition of a constructive trust over improperly retained funds, declaratory relief, and any other equitable relief necessary to make Plaintiff and Class members whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendants to reimburse all persons who paid the unlawful and discriminatory surcharge;

D. A declaratory judgment that Defendants breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants

30

without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to notify participants of an alternative standard, and for failing to adequately monitor the terms of the Plan, the surcharge, and the wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E.  An Order requiring Defendants to provide an accounting of all prior payments of the surcharges under the Plan;

F.  Declaratory relief as necessary and appropriate;

G.  Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H.  Restitution of all surcharge amounts Defendants collected;

I.  Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of its collection of the unlawful and discriminatory tobacco surcharges;

J.  Relief to the Plan from Defendants for their violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations; disgorgement of any benefits and profits Defendants received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendants to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K.  An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L.  An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M.  Any other relief the Court determines is just and proper.

Dated: February 3, 2026             Respectfully submitted,

*/s/ Philip J. Krzeski*
Philip J. Krzeski (OH #0095713)
Bryan L. Bleichner*
Christopher P. Renz*
**CHESTNUT CAMBRONNE PA**
100 Washington Ave S, Ste 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
*pkrzeski@chestnutcambronne.com*
*bbleichner@chestnutcambronne.com*
*crenz@chestnutcambronne.com*

Oren Faircloth*
William Payne*
**SIRI & GLIMSTAD LLP**
745 Fifth Ave, Ste 500
New York, NY 10151
Telephone: (212) 532-1091
*ofaircloth@sirillp.com*
*wpayne@sirillp.com*

Attorneys for Plaintiff and the Proposed Class

* *Pro hac vice* forthcoming

32